Kingdao Sea-Line Trading Company v. United States Kingdao Sea-Line Trading Company v. United States Kingdao Sea-Line Trading Company v. United States The issues that have surfaced really are the agency's discretion in reaching certain decisions in terms of the use of best available information under the statute 1677B. Specifically, there are two issues that we're dealing with. The first deals with the calculation of the surrogate value for the garlic. Counselor, in that regard, one of the questions that we're looking at is the price movement of garlic and grade A, grade SA and grade A garlic, whether they move in tandem or not. What evidence did you submit to show that they do move in tandem over a long period of time? Your Honor, on the record, there are two data sets. One was filed by what we call the petitioners. This is the Fresh Garlic Producers Association, and that's the database that we refer to as the Azupor APMC. The other database on the record is the one that was submitted by Sea-Line, and this is the AgMartNet. I mean, this is the summary, but it's a set of data that was provided or produced by the Indian Ministry of Agriculture. These are the raw data that provide the actual prices in India. Again, they're not intended necessarily to be. But doesn't the ag market data just give you price trends for garlic in general as opposed to different grades of garlic? That's correct, Your Honor. So what other evidence did you submit to show the difference, a price movement of super or SA garlic and grade A garlic? We did not submit any specific data on that because the database that was submitted by the petitioners in the case did break it out by the size, whereas our, as you're correct, the data that we provided just was the raw data, but it provided actual quantities of individual sales, whereas quantities are not provided in the APMC data that petitioners filed. So when your opponents argue that the data that they submitted does not necessarily show a correlated pricing trend and you haven't submitted anything in opposition to that, then shouldn't we fine for the Department of Commerce based on substantial evidence? No. Well, Your Honor, there is considerable evidence on the record, and indeed part of it was submitted by the Commerce Department when they supplemented the record following the lower court's remand. So when you have the data, you will see there are various charts that have been provided that go back to November of 2001 all the way through the period of the New Shipper period of review, which was April of 2009. So you will see an actual breakdown, and there are charts that actually show when the Super A garlic was available and sold in the market. Those charts, we believe, show a very high positive correlation between the A and the Super A. There was a chart that I saw that only showed six months before the relevant time period the price points for all the different grades of garlic. And then I think it was the court below, as well as Commerce, that commented that six months of data is just not enough to feel confident that all these different grades of garlic in terms of price move in tandem over a long period of time. Your Honor, I think that's not correct. I want to be clear that what has happened in this case is that the petitioners filed a database in their CD-ROM that covered a period of 22 months of data. It's not six months, but 22 months of data. When you look at the data, and perhaps when I have rebuttal time, I'll come and I will focus specifically on where those  And actually, as the Commerce Department amended it, following the remand, it does indeed go back over eight years approximately. So, you know, I will show you exactly the charts that were prepared, but I think it's not six months. It's 22 months, of which eight or nine months have the actual Super A garlic price. But there's no pricing data for Super A garlic prices for the review. That is correct, Your Honor. For the New Shipper period of review, there were no Super A. Why not? Well, you know, we can speculate. And if there are several things on the record that would indicate some reasons why, when we look at the exchange rate, we notice that there was a global economic situation that seemed to affect India as well. So that you see that the exchange rate changed from approximately 40 rupees per dollar to 50 rupees per dollar. I based that on the actual text from the Tata T Financial Statement of 2008-2009. We put it in a footnote to our brief, but it shows you that the exchange rate changed. And, you know, it's hard to say that this is an agricultural product. And I think the Commerce Department was posing the same question, but it's only speculation. What we do know is that actual prices, whether it includes the quantities or not the quantities but just the prices, are the actual prices in the Indian market. So that's the uncontested part that we are arguing, that, you know, do you have actual prices? If one asks why, you know, that's speculation. We don't know and we couldn't answer it. We did not put the APMC data on the record. So your proposed alternative is to use the A-grade actual prices for the review period and then use some ratio to scale up to what you would imagine super A-grade prices would be during that time, right? Absolutely. Did you put in any kind of proposed calculation of how that ratio would be determined? Absolutely. And where's that? Okay. Well, there is a, the Commerce Department actually made a calculation. I would point out it is on page 16 of our reply brief. But the Commerce Department in its calculations for the surrogate value for garlic actually calculated what the different prices were during the two periods. It's the, and it appears on the second line in the page, it's 40 kilograms. And I will point to, for example. How did you calculate that ratio? The Commerce Department calculated it. Okay. Did you ever present? Oh, absolutely. And where's that? And in the case brief that C-Line filed, they calculated a figure. Let me see if I can find this quickly for you. We, it came out to the same figure of 1.66. And I'm looking at page A-164. What page? Okay. I'm looking now at the appendix in A-164. The previous reference I was making was to our reply brief on page 16. But on page A-164 of the appendices, you will see that the calculation was made that comes out to 19.90 rupees per kilogram based on a super A to A garlic ratio of 1.66. The number is precisely the same. Now, let me explain how this was done. They took, as we understand the calculations, Commerce looked at the prices during the previous one-year period of November through April of the prior year, 2007 to 2008. That's a six-month period, right? Yeah. Well, because the new shipper review was also a six-month period of review. So they took the corresponding one year earlier where you had all four categories, the C, the B, the A, and the super A garlic sales. Then they compared what the price was during that same period, and that's the ratio of 1.66. That's the same figure that Commerce has put in their calculations both at the end of the preliminary review for the calculation of surrogate value as well as for the final. So the numbers are corresponding. We did not make up those numbers. Those are exactly the same numbers based on that prior six-month corresponding period. Right, which was what the court below said is just not enough time to feel comfortable that there is some kind of close connection between the prices of various grades of garlic with super A grades, right? Well, yes, Your Honor. Can I just sort of approach this slightly differently? But, yes, and to finish answering your question, I think that what the Commerce Department did, whether it was intentionally or unintentionally, when it went to prove that the size of the garlic was, Commerce used the term most important in terms of determining what the price should be, how they would calculate it, that you're looking now at long periods of time. I will point out where in the appendix this is done because it's the Commerce figures on the record that show the movement of both go up and down very much in parallel. It's not an exact science, but I would also argue that using the most recent period for a relationship between the super A garlic and the A garlic is the most meaningful because while there is a price pattern over time, it's an agricultural product and the impact can change for weather reasons, for other things. When you look at the data you're referring to, it does look like prices for grades A through C do move in tandem, but that's not the case with grade SA, is it? Well, Your Honor, I... I mean, it doesn't move in tandem as the other grades move. Well, we think it does. Now, the reason we say this, and if I could just step back for a minute, what we're talking about is millimeters, and I'm sure that you're familiar with converting millimeters to inches, but I made the calculation, and what we find is that one inch is equal to 25.4 millimeters. So we're talking about different sizes in the grades of garlic that could really fit between your thumb and your forefinger. So when we're looking at, and let me add, I think at this point we need to just explain that the garlic size that we sold was 65 millimeters. I mean, there's no reason to keep, you know, that sensitive after four years of time has passed. The difference between that size and the A size, the size that Cline sold, and the A is one quarter of an inch in diameter. So what we're looking at, if you're looking at the A, which is typically 40 millimeters to 55 millimeters, that's one and a half to two inches in diameter. The Super A at 65 millimeters is 2.9 sixteenths of an inch, just over two and a half inches. What's the size of the B and C grade? Okay, the B and C, the C is less than 30 millimeters, which converting it at 25.4 comes out to about one and a quarter inches. Right. That's the C. Then you go from one and a quarter to one and a half for B, to, you know, one and a half to two inches for the A, and then two to two and a half inches for the grade Super A. So the fact that we're living in a world where there's this sensitivity to small differences in size of the diameter to create these different grades of garlic that are being priced at different price points, doesn't that suggest that even though you're telling us that Super A grade is only a little bit bigger than A grade, in fact, size does matter, because now we're carving up all those garlic sizes into different categories, even though they, in the scheme of things, look to me like a relatively small difference. That is correct. So then I don't understand the argument you're trying to make, which is that Super A grade is only a little bit bigger than A grade. Well, maybe it does matter. Well, you know, the record has a number of explanations of how this, you know, when it was in the market, when it wasn't in the market, and, you know, initially it was introduced, they believe, according to the record, that it was done by a Chinese bringing it into India. Size appears not to be as much of an issue in other countries as it is here in the U.S., whether you're buying oranges, you like, you know, it sells for more because it's larger. The USDA report indicates that sizes, it increases depending on size, but it doesn't say you pay a premium. I think the term that the USDA report gave was that the price increases, there's a premium price as the size gets larger, but there is no information. I'm having a hard time following your argument. In the agriculture industry, it's not so much a size as grade, and grade can be established through quality, but often it's by size, like pecans or walnuts, and we're hearing garlic, and in the industry it has graded garlic according to a grade, has categorized it by grade, which is established by size, and all the data that we have show that prices follow those same categories and those same grades. Well, they do, and again, at the risk of giving you an example such as eggs, you know, you go to the market, you get small, medium, large, and, you know, extra large eggs, but the price is not independent one from the other, and if you are buying the Super A or you'd like and it's not available, you can buy the A. There is no information on the record that says the quality, the taste, the use is any different depending on size. It's a consumer preference to buy, to pay more for the larger size. That's the point we've been trying to make throughout this entire exercise. So whether the actual, you know, the availability of the Super A, you know, there is availability in the Indian market, you know, it may not be available for reasons over which we can only speculate, but it doesn't mean that you can't substitute the A for the Super A, just as you do with eggs. So we find on the record and based on the experience of our client, there's no difference. You know, it's a preference in the U.S. market for a larger size, and many would argue that that's not the criteria, that it tastes better. Smaller sizes are more flavorful, different countries, different people have different preferences. So what we're looking at is, and it was certainly our effort to show, that if you look at it over time, when all four grades, or at least when the Super A was available in the Indian market and prices were reported, those prices moved quite significantly together. I would point out in one of the charts that we used, or that, you know, was on the record, that you see that the price sort of peaked up when we got to February 6th, because that was the last reported prices in the Indian market before the period of the new shipper review. It tended up, but there was only a sale through February 6th. So if those prices had continued, we believe that that upward trend at the end, while the other prices were going down, probably would have gone down, but it didn't follow, because we were using a monthly average figure. Okay, let's hear from the other side, and we'll save you rebuttal time, Mr. Hughes. Thank you. Okay, Mr. Schroeder. May it please the Court. And it might be helpful if you commented on the points that are concerning us. Yes. The Sea Line's first challenge in this case is Commerce's decision to rely on an all commodities index to inflate Super A Garlic Bulb prices from an earlier time period, roughly a year earlier, to the period of review, which is November 2008 through April 2009. Commerce's decision to adjust the prices of Garlic Bulb to the period of review by using the International Monetary Fund Index is supported by substantial evidence. Commerce found that the IMF Index was the best available information. Before we get to the All Goods Inflationary Index, can we get to Commerce's choice of using the 07-08 time period for Super A prices, rather than using the 08-09 actual prices for A grade garlic, and then bumping that up by some ratio? Yes. What is Commerce's best evidence it can point to to give us some comfort that it was appropriate and the better choice to go with the 07-08 prices available for Super A grade, rather than the 08-09 A grade actual prices that were available with the scale up? Yes, and that goes to an argument that... Let's assume that argument is before us. Okay. So Commerce was faced with a choice to use APMC Bolton prices that were slightly older. The exact time period is November 2007 through, as Mr. Youm stated, February 6, 2008. And those matched C-Line's Super A garlic. That's what C-Line sold, garlic over 55 millimeters, all Super A. So what's the evidence that supports that choice to use that price time period? Well, the evidence is the chart, for example, on page A-432, which Mr. Youm was partially referring to, that shows the prices of the APMC, and there's tables that show the prices of this APMC. But those tables, and what you're referring to, they don't justify Commerce's use of an earlier period of prices of an earlier, well, of a prior time, as opposed to using contemporary prices. Shouldn't Commerce focus on grade A and grade B, figure out a ratio, and then apply the inflation index to that? And that way you have an accurate reflection of prices within the period of review. Yes, and that's, well, the answer is we believe not, but that's correctly defining the issue. And... Well, why not? That's what we're asking. Okay. Commerce is faced with a choice between, essentially, a couple of different methodologies here. The one that they use... What justifies the methodology that Commerce picked? What's their justification for using that? Because Commerce explained earlier in this case why bulb size is more important than contemporaneous. That was in contemporaneousness. That was an issue early on in the case. They added some documents to the record that showed that bulb size is the most important determinant of the price... Why is bulb size more important than showing prices as contemporaneous that you pull out within the period of review? I mean, we know what the issue is. We're asking you, what supports your argument? Yes, and it's the documents that are in the record, the market research report, the MRR update, the USDA report which said that people or purchasers pay a premium for large bulb garlic. It's uncontested that the larger the bulb, the more the garlic costs. Mr. Humans acknowledged that in their briefs. Commerce has got a decision. It's presented with two different and perfect alternatives. One is to go with product specificity. What is the most product specific information record? Well, product specificity is clearly Super A garlic. Well, the slight problem with that is it's not contemporaneous. So, it could then look at the contemporaneous garlic, but the garlic is not product specific. It's A grade garlic. It's a smaller grade than plaintiff's garlic. So, Commerce adopted a methodology to account for the differences in size using prices from an earlier period. Why couldn't it have used the same type of methodology in taking contemporaneous prices and then upping it up to the grade SA? Because Commerce found that it is more accurate to inflate. And it's not a period of review that is that far in the past that they looked at the garlic sizes from. So, given that it was in a year, Commerce decided to take the more product specific prices and apply a price adjustment factor. And they've done that in the past and they find that this is generally the most accurate way of doing this. And then they looked at plaintiff's competing methodologies and said, well, are those better or not? And what they concluded was that... Do you agree with your opponent that he submitted evidence for alternative methodologies? Well, he submitted, there's some evidence. However, Commerce found that the evidence was not satisfactory. Celine argues that they submitted what they call the garlic specific inflation. Did your opponent submit actual methodologies, the economic formula, the ratios, and they struck Commerce, this is how you do it? I believe they came up with a ratio of 1.66 that was discussed in Mr. Hume's opening. Right, and Mr. Hume said that came from the government, that ratio. It wasn't something that Mr. Hume generated or his client generated. That was something that the government generated. I'm not sure if the government generated it. I didn't see that document in the appendix, so I can't answer for sure. But even if the government generated the problems they found... Well, counsel, this issue is important to your case. If you can't explain to us whether your opponent submitted the evidence or whether the government did, that makes a big difference. I think that what the government found was that they couldn't assume a ratio. They could not assume that there was a... that these garlic prices moved in tandem. So that ratio is invalid. It is speculation, and that's what the trial court found. C-Line argued Commerce should rely on such a ratio between grade A prices and grade super A prices to determine what grade super A prices would have been. The trial court correctly found that C-Line's argument was speculative, that C-Line admits in its brief that it merely presumed that the prices for garlic rates moved in tandem, and the court found that the record does not show that the super A prices were subject to the same market conditions as other prices. Do you know what the actual inflationary rate was that Commerce used to bump up the price for the 07-08 time period for super A grade garlic? There's a chart that is included in the reply brief. Yeah. And according to that chart, it's pretty modest. Page 15. Is that the grade brief? Is that an accurate reflection of what the price is that Commerce calculated for super A grade prices over the relevant time period? Well, I don't think this is, there were no super A prices. I know. This is the surrogate value or the normal value created that would, is this an accurate reflection of Commerce's position of what the price is going to be assigned to super A grade over the relevant time period? I would have to reconfirm that. Yeah, that's the chart I was going off of. I'm not 100% because it's not our evidence that, I would have to look back. You support Commerce's decision? Yes. Okay, but what factor did Commerce inflate the earlier grade SA prices? I think this chart shows it was something like a 4% inflation. Inflation, it was a modest increase in the prices. The real issue here is that... The inflation indicator came out of the IMF, right? Yes. I'm sorry, the IMF wholesale price index for all commodities. Correct.  I'm sorry, I'm not sure of that, but I think it was around 4% from looking at the documents in the record. I can't point to that exact document now. However, the issue here is that plaintiff is contending that rather than a modest inflation, there should have been a very large deflationary index applied. Did Commerce have any discretion to say, okay, we're not going to put an inflation bump up on the Super A grade prices for the relevant time period because all of the prices for all of the other grades of garlic came down like a waterfall during the relevant time period. So, you know what? It would probably be kind of unreasonable for us to put an actual bump up on inflation in this particular circumstance. Could Commerce have done that? That we're not going to add an inflationary bump up here? I presume Commerce has the discretion to make a judgment call like that, but it's not the judgment call Commerce made. Instead, Commerce stated that it would use its normal methodology, because this is a tried and true methodology that's used in the past, to take a price, inflate it by the wholesale price index, as opposed to speculating that there's a ratio, and the ratio was proposed by the plaintiff but not proven to be accurate. And Commerce is faced with two imperfect data sets, and it has to make a judgment call on which is the best available information in the record, and here it chose to use the wholesale price index, and that was reasonable, supported by substantial evidence in the record, and Commerce also found that plaintiff's proposed method was not supported by substantial evidence. So Commerce chose the best available information in the record, and its decision on this and all other issues should be affirmed. Counsel, it's difficult following your oral argument. I really suggest that you and all counsel really be familiar with the record before the case to help us. When we ask you a question and we're referring to the record before us, this is your case. You should have this stuff called. Yes, I apologize, Your Honor. I was not sure of that inflationary index. I don't know for sure. I don't want to represent the court, and I could provide it to the court in a supplemental filing if you wish. We'll see if Mr. Corsi knows the answer. Do you know the answer to this question? Your Honor, I didn't know the answer. Come forward. The Commerce Department pointed out it's on page 139, and the break is one minute. Come closer so that your remarks are recorded. Okay. Thank you. Thank you, Mr. Schroeder. Your Honor, I'm Michael Corsi for Defendant Intervenors below. Counsel for Commerce pointed out quite quickly it's page 139 of the record, and the rate is 1.04%. I have a – in other words, you can just tell by looking at that page 15 that you're going to have close to a 0% inflator because you've got a flat line, basically from the time super rate prices disappeared. In my time, I would like to try to respond to your questions about why did Commerce use super A values that were outdated and inflate them. You have to understand, what did Commerce do on remand from Judge Eaton? Judge Eaton asked a good question, said the same thing. Why did you do that, Commerce? What justifies that? What did Commerce do? Commerce put two reports on the record, a 2003 report that petitioners put on the record, India market research that we retained, full complete study that talks about the garlic market in India, 2007 report, which was a four year later revisit. The problem here is this. Commerce, in a non-market economy case involving agricultural products, has to pick a country that is a substantial producer, a market economy country of the subject merchandise. India is the number two producer in the world. Only behind China. But, the garlic produced in China, 99% is tiny. Tiny bulb size, and multi-cloved, and pungent. Now, totally unlike product produced in China, and product produced in the San Joaquin Valley in California. And this is all about, as Jimmy Buffett would say, latitude. Those production areas are in the same latitude. India, for the most part, is lower. And everywhere in the world, you go close to the equator, you get smaller bulbs, you get more cloves, and you get more pungent. What the 2003 report shows is there was a big effort in the northern part of India, which is on the same latitude as the production areas in China, and the San Joaquin in California, to produce a Chinese-like product. This product, same as in California. Big bulb, white, beautiful, few cloves, not pungent. That product was, and that report was all about, what we were trying to do back then is, the Chinese had started coming in, they were going through their cost of production, their factors. Okay, so commerce chose to base the review on the size of the bulb. Right. Okay, so the question I have, it went back and took the SA prices for a period before the period of review. Then it inflated it to account for inflation, right? But yet, the data that we have show that garlic prices for all garlic, even the little bit that these charts show for grade SA, started a downward trend. Why didn't commerce account for a deflation factor for that downward trend? Well, commerce said it didn't do that because the petitioner, I mean, sorry, the plaintiff didn't put evidence on the record for the calculation. But the real reason is that counsel for appellant is wrong. There is much more difference than just size between Super A. Super A was prices for a very short period of time that came on the market. That's why we put on the 2007 report in an earlier review, where they were marketing this product. But if commerce can reach back and inflate a price by using the IMF WIP index, why can't it also account for what's clearly what the data shows, a downward trend in prices during the period of review? What commerce found and what Judge Eaton affirmed was that the period, the nine or ten months over the 22 months that SA product was on the market before it disappeared was not enough to come up with, to allow the department to conclude that this was a trend, that this is something that would hold fast going out in the future. Right, right. But it did account for an inflation. There's nothing to indicate that price is inflated either. But it's reasonable that price is inflated. So use IMF data for that. But when the data also show that all prices for garlic went on a downward trend during the period of review, shouldn't have commerce also adopted a deflating index to account for that price drop or a price drop? In order for commerce to do that, they would have to conclude that yes, there is a correlation, that the correlation that was evident from the short period of time that the Super A garlic was on the market would have continued out to this period. Well, I don't want to belabor the point, but commerce assumed that there was an inflation to the price. Shouldn't it assume, in view of actual data, that there was a downward trend in prices, an overall downward trend? Your Honor, commerce's practice is to use the WPI index for the country and they took what they found. What they found was a 1.04% increase. Your question, I think, would require commerce to determine that, to accept that yes, what we can tell from this chart that is in the main brief of the plaintiffs at page 16, is that in this latter period, in the period of review for this review, the prices of the Indian small bulb garlic is down. We can assume that the prices for the SA, were they on the market, would be down as well. Do you know where the 1.66 ratio comes from, that Mr. Hume pointed to in the joint appendix? I am sorry, I do not know where that comes from. Okay. We'll ask Mr. Hume. Thank you, Mr. Corsi. Thank you, Your Honor. Mr. Hume, can you find the 1.66? Excuse me, Your Honor. I just, I think, I appreciate this because this is the core issue in our case, so I appreciate our ability to clarify this if there's any question. What I, and I agree, the rate of inflation was 1.04 and that's the chart that we used on page 15 in our table one. And it just was to graphically show you what the price of the SA was doing versus the other side, you know, with the other grades of garlic. I would also, you know, point out that Sea-Line did attempt to put on the record what the Indian garlic WPI was. And for reasons that, you know, it was not clear enough to the department when it was submitted, but it would show that the garlic prices, the Indian government's garlic price ratio, which we put on the record, fell, went down as well, reflecting what the prices were. The court below rejected this because you were referencing the wrong website, right? Correct. And then there was also no way to actually verify the numbers that you submitted. You're correct. That's how Commerce viewed it. That's not our view of it because the website was correct. It got you through the front door. It didn't get you through the second door. It's a fact-finding though, right? It's a fact-finding. We're required to give some deference to it. Well, and Your Honor, one of the issues that has come up in this case is why we were not afforded an opportunity to correct that, clarify it, because we were not aware that there was a problem in doing it. As the Commerce Department, I should add. Well, apart from the website, wasn't the problem that the actual data that was supplied on there could not be verified or it's sourced? There was no source citation for it. Well, Your Honor, it came from the Indian Department of Agriculture. The question is that then it went to the Office of the Economic Advisor, which took you to the specific WPI index. I mean, we can show you this, but I don't want to. It makes no difference except it was the third source that showed you that Indian garlic prices actually fell. Had we been given a chance, we could have shown that if you go to the Economic Advisor, you would have gotten exactly that same data. I mean, the data that we showed on the record. We didn't create that from whole cloth. In fact, there's considerable detail, as you see, as to how those figures were devised. I mean, one of the issues we had was we were not given an opportunity to correct, clarify that calculation. So if I can finish very quickly, I just want to be sure that we're not, you know, I was trying to show you on page A431, which goes back to November 2001. You see when the Super A garlic was on the record, prices attract very closely to what the other garlic sizes were. And similarly, when you go to the next page, which is page A432, you see that covers the more recent period, but it shows you that as soon as, you know, when the garlic SA was in the market in India, it tracked very much what the Super, I mean, what the Grade A garlic did. It doesn't maintain the same track as the other garlic grades, though, does it? I mean, there is a difference. There's a data point of February 2008. That's breaking away. Correct. And the reason is the data only goes through February 6th. So what I was trying to explain before is we believe that had garlic continued to be sold, the Super A, it would have followed down. But what you've got is each of those data points is a month, whereas when you look at the last data point for the Super A, it's only six days. So as it trended down, it only hits a part trend, and that was the end, as opposed to a full month, which we believe, consistent with everything else in that chart, they track very closely. Any more questions for Mr. Hume? Thank you, Mr. Hume. Thank you all. I appreciate it. Thank you all. The case is taken under submission.